(C.D. 2891)

U. S. BLANKET CORP. *v.* UNITED STATES

United States Customs Court, First Division

(Decided February 14, 1967)

*Siegel, Mandell & Davidson* (*Joshua M. Davidson, David Serko,* and *Allan H. Kamnitz* of counsel) ; and *Hart, Hume & Engelman* (*Robert R. Hume* of counsel), associate counsel ;* for the plaintiff.

*Barefoot Sanders,* Assistant Attorney General (*Mollie Strum,* trial attorney), for the defendant.

Before OLIVER and WATSON, Judges, and WILSON, Senior Judge

WILSON, Judge: Six protests were consolidated herein for trial. The merchandise consists of blankets which are invoiced as in chief value of cotton. These items were exported by the manufacturer-shipper, Fratelli Sbraci fu Alimo of Prato, Italy, between April 7, 1956, and November 21, 1957.

The collector at the port of New York classified the imported material and assessed duty at 30 per centum ad valorem and 30 cents per pound under the provisions of paragraph 1111 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, which reads as follows:

---

*Substituted as counsel after trial.

Blankets, and similar articles (including carriage and
   automobile robes and steamer rugs), made as units or
   in the piece, finished or unfinished, wholly or in chief
   value of wool, not exceeding three yards in length;
   all the foregoing which are not hand-woven, regard-
   less of value_____ 30¢ per lb. and
                                                     and 30% ad
                                                     val.

The importer, by timely protests, claims that the imported blankets
are dutiable at 7⅛ cents per pound under the provisions of paragraph
911(a) of said act, as modified by the Torquay Protocol to the Gen-
eral Agreement on Tariffs and Trade, T.D. 52739, which provides as
follows:

Blankets or blanket cloth, napped or unnapped,
   wholly or in chief value of cotton, whether in the
   piece or otherwise:
        Not Jacquard-figured_____ 15% ad val.,
                                                   but not less
                                                   than   7⅛¢
                                                   per lb.

Counsel stipulated that the blankets involved herein are not Jac-
quard-figured and submitted the case on a stipulation, which, so far as
pertinent for our purposes, reads as follows:

1. The questions propounded to Oscar Sbraci, and the answers
thereto, as transcribed before Richard H. Martin, Vice Consul of the
United States at Florence, Italy, commencing on November 26, 1963,
concluding on December 5, 1963, and taken pursuant to an order of
this Court dated November 13, 1963, in both the English and Italian
languages, shall be received in evidence herein without the necessity
of being marked, subject to objections as hereinafter provided for.

2. The exhibits offered by both parties and marked for identifi-
cation with appropriate markings of the said Vice Consul, shall be
received in evidence, subject to objections as hereinafter provided for.

3. Defendant's Exhibit "C" for identification, which consists of
the answers of the witness Sbraci to written direct and cross inter-
rogatories propounded to the witness by Vice Consul Harold E. Horan
at the American Consulate in Florence, Italy, dated June 26, 1963,
shall be deemed to also include the written direct and cross interrog-
atories submitted by respective counsel herein, which are now a part
of the Court files.

4. The respective parties hereto by their counsel shall have the
right to raise objections to the questions propounded of the witness,
and/or the answers thereto, and/or the exhibits referred to herein,
such objections to be included in the briefs submitted to the Court by
the parties as hereinafter provided, or in separate statements filed
simultaneously therewith.

Pursuant to the foregoing stipulation, counsel filed briefs and reply briefs together with objections to certain evidence. The record is needlessly voluminous due in large measure to the inclusion of extraneous matter and repetition. The briefs and objections filed by plaintiff aggregate 97 pages and for defendant 126 pages. The answers of the witness Oscar Sbraci to written direct and cross-interrogatories, dated June 26, 1963, total 9 pages. The oral testimony by the same witness, as translated into English at hearings commenced on November 26, 1963, and completed on December 5, 1963, total 170 pages. Both parties offered documentary exhibits in substantial numbers, all being marked "for identification," subject to objections as heretofore indicated.

The court finds the objections made by the respective parties to certain questions and to the exhibits should be overruled. The lengthy, argumentative statements made by opposing counsel shed no real light on the facts herein or upon the law applicable to the case. After reading and considering the depositions, the exhibits, and the objections as filed, the court hereby overrules all said objections and admits all the testimony and all of the exhibits. Of course, statements by counsel are not evidence and will receive no further consideration.

The question presented for decision is admittedly one of fact, that is, whether or not the imported blankets are wholly or in chief value of *cotton*, as claimed, or wholly or in chief value of *wool*, as classified. This issue of fact must be determined from the evidence. There is no dispute about the law. The *value* of the separate parts or component materials from which the imported blankets were manufactured must be found. The value *at the time those materials were ready to be combined or assembled* to make the completed blankets is the basic fact to be resolved. As used in this context, *value* refers to the cost of such components to the manufacturer of the blankets. In *United States* v. *Jovita Perez et al.*, 44 CCPA 35, 39, C.A.D. 633, the court stated:

* * * it has been held that to determine the component material of chief value, the rule is that the value of the materials of which an article is composed shall be ascertained at the time when they have reached such condition that nothing remains to be done to them except to put them together. [Citing many cases.]

Counsel for the respective parties agree that the law as stated above is controlling and cite other cases setting forth the same rule, among which are *United States* v. *Mrs. S. Bacharach*, 18 CCPA 353, T.D. 44612; *United States* v. *Rice-Stix Dry Goods Co.*, 19 CCPA 232 T.D. 45337; *Bullocks, Inc.* v. *United States*, 2 Cust. Ct. 184, C.D.

119; and *Commercial Adolfo S. Pagan, Inc.*, and *Insular Construction & Supply Co.* v. *United States*, 48 Cust. Ct. 210, C.D. 2337.

As a general rule, a presumption of correctness attaches to the collector's classification. To overcome such presumption, the protestant has the burden of proving not only that the collector's classification is erroneous, but also that the classification urged by the protestant is correct. *Atlantic Aluminum & Metal Distributors, Inc.* v. *United States*, 47 CCPA 88, 91, C.A.D. 735, and cases cited therein. However, in the instant case, *if* the importer establishes by competent, credible and convincing evidence that the cost of the component, cotton, to the manufacturer at the time the various components were ready to be combined or assembled to become the completed blankets, exceeded the cost of any other component material therein, the protestant will have met his burden to establish that the imported blankets, as claimed, are wholly or in chief value of *cotton*. It is obvious that such proof would establish that *wool*, as classified, *cannot at the same time* be the component material wholly or in chief value of the involved merchandise.

Oscar Sbraci, 70 years of age, the only witness in this case, testified is an oral deposition and in written interrogatories that, from "March 1926 [sic] (obviously should be March 1956) to July 1958, he and his brother Metello owned and operated the exporter (a stock company in which the two brothers owned 98 percent of the stock; that the firm manufactured textiles and blankets. He stated that he was familiar with the blankets manufactured by his firm which were shipped to plaintiff and to Irie Manufacturing Co. and Blankets, Inc. He dealt with Larry Curtis who represented these firms, and with Giovanni Ruben Pedrazzo who was their representative in Italy. He asserted these men gave him written instructions concerning the blankets to be exported, but the witness could not produce said written instructions or account for them satisfactorily, so he said he also received oral directions from Curtis and Pedrazzo. Such blankets were not for sale in Italy. He stated that Curtis gave him a sample which is no longer available, and that Curtis told him that cotton included in the blankets should have a higher value or price than any other single component of the blankets. Mr. Sbraci further testified that he controlled the preparation and keeping of records including a day book with regard to the quality and quantity of material which was then sent for spinning. But no such records were produced although it appears to the court that it was plainly within the power of the witness to bring said books into court if they actually exist. He stated he was familiar with the materials used, their cost, and the processes employed in production of the blankets as this was his work. Yet he testified that "after so may [sic] years I do not remember details" as to the cost of all component materials used in the production of these blankets or

the labor and appropriate share of overhead expense to bring them into the condition ready to be united with other materials in the blanket. The witness stated that the materials used between March 1956 and July 1958 were: new cotton waste of various qualities among which was Pinisello, regenerated cotton, regenerated rayon, and reprocessed wool. After purchase, these materials are passed on for spinning in the "percentages established by the necessary compositions. The yarn so obtained is then sent for warping, weaving and for finishing." Sbraci also stated that the formula changed in September 1957 and remained until July 1958. The new formula was unlike the first as it was made with the chain of new cotton waste of a much finer spinning quality. He *presumes* that the first blankets made with the new formula were made in August 1957.

The inconsistencies, contradictions, evasions and outright misrepresentations in the testimony, oral and written, of this witness, and in his practice of creating fictitious documents for the purpose of deception, are so glaring that his evidence is entitled to no credence. It is tainted in such way that one must conclude that Mr. Sbraci's testimony is utterly unworthy of belief insofar as it relates to the basic issues in this case. The following excerpt from Mr. Sbraci's testimony bears out the foregoing appraisal of his evidence and credibility:

[Q.] For any convenient quantity of the blankets mentioned above, i.e., one piece, one dozen, one kilo, or one hundred, please state the cost of all the component materials used in the production of these blankets. The costs should include all materials, labor, and the appropriate share of overhead expense to bring them into condition ready to be united with the other materials of the article. Any cost of weaving, or of manufacture, or finishing subsequent to joining of the materials should not be included.—[A.] I am not able to answer this question. After so may [sic] years I do not remember details.

The foregoing interrogatory was propounded by counsel for plaintiff. The answer really disqualified him from giving any pertinent, reliable information concerning the material of chief value in the imported merchandise. Yet in other parts of his testimony he attempted to give the impression that he knew the value of the materials involved in the manufacture of the blankets.

It seems clear that Mr. Sbraci tried to give testimony which he thought would help his American buyer establish by a false record that cotton formed the material of chief value in the blankets. On page 18 of his oral deposition, Mr. Sbraci testified as follows:

[Q.] Mr. Sbraci, I show you Plaintiff's Exhibits 2(A), 2(B), 2(C) and 2(D) for identification and ask you who prepared these notes and summaries.—[A.] I did.

[Q.] And from what records did you prepare those notes?—[A.] From notes in my possession, from bills, and from costs of production.

[Q.] I show you Plaintiff's Exhibits 1(A) through 1(X) for identification and ask you whether these are some of the invoices which you

used in preparing Plaintiff's Exhibit 2(A) through 2(D) for identification?—[A.] Yes.

[Q.] Are the invoices represented by Plaintiff's Exhibits 1(A) through 1(X) for identification true and exact copies of the original copies?—[A.] Yes.

[Q.] Can you tell us where the originals of these purchase invoices are?—[A.] I do not know because all the documents regarding the Fratelli Sbraci fu Alimo firm, which was liquidated, were given by me to an employee of the liquidator and this was at the beginning of 1960, the liquidator assigned by the Tribunal of Florence.

[Q.] Why did you make these photocopies?—[A.] Because they were requested by Mr. Larry Curtis of the firms that purchased the blankets from Fratelli Sbraci fu Alimo.

The exhibits referred to, he admitted later, contained four fictitious invoices (plaintiff's exhibits 1(V), 1(U), 1(M), and 1(R)) from The Toscana Company, Inc.

On the 27th day of April 1960, the witness Oscar Sbraci made the following statements to a police commander in Italy:

QUESTION–We are showing you four invoices, in photostatic copy, by "The Toscana Company, Inc. New York", Prato Branch, issued in Prato respectively on December 12, 1955, December 28, 1955, December 23, 1956 and April 12, 1957, to the name of the Firm "F.lli. Sbraci fu Alimo S.p.A." of Prato, covering a total of 56,139 kgs of cotton waste, and specifically "waste of new cotton, dyed black", "waste of new cotton, washed", "greasy Pinisello", "greasy cotton waste". Will you explain the origin of these invoices?

ANSWER–I have prepared those invoices personally, and they do not reflect purchases of new cotton waste from The Toscana Company, Prato Branch. I have prepared those invoices on a request for documentation made verbally and personally by a foreign customer from New York, Mr. Curtis, who needed it to prove the cotton contents of a lot of blankets supplied to him by the Firm "F.lli Sbraci fu Alimo S.pA." of Prato, of which I was a Director. To prepare the said invoices, I used letterhead of the "The Toscana Company", which had been left in an office of my Firm from the days when my nephew, Luciano Sbraci, was Representative [Agent] of the Prato Branch of The Toscana Company. At the time when I prepared the said invoices, I did not inform Mr. Luciano Sbraci. I did so at a later time, explaining the reasons which had led me to prepare invoices on "The Toscana Company" letterhead, but not reflecting actual purchases of new cotton waste from the latter. I wish to say that, in reality, in making the blankets supplied to the Firms "U.S. BLANKET CORPORATION" and "I.R.E. MANUFACTURING COMPANY INC.", I have used 48,474 kgs of new cotton waste, as shown by the purchase invoices I am producing to you, and not 104,613 kgs as it would appear from the quantity in kgs shown on the bona-fide invoices plus the 56,139 kgs shown in the four fictitious invoices you have shown me. Since the said invoices were for the sole use of a foreign purchaser, in order to make them appear more realistic, I have affixed on two of them the statement to the effect that the IGE Tax had been paid by postal

order to the Florence IGE Office I, without specifying the order number, because the tax had not actually been paid since, as indicated above, no real invoices were involved. Also the other notations type-written on the invoice were personally affixed by myself, again in order to make the documents appear more credible. The foregoing is confirmed by the fact that none of the four invoices you have shown me was entered in the books of "F.lli Sbraci fu Alimo S.p.A." of Prato.

QUESTION–What was the real composition of the blankets shipped in the period from the Fall of 1956 to the Spring of 1957 by the Firm "F.lli Sbraci fu Alimo" to the above mentioned American firms?

ANSWER–The approximate percentages are those shown in the invoices, i.e. 40% of wool, 40% of cotton (of which 14 to 17% of new cotton waste and the balance of reclaimed shredded cotton) and 20% of cellulose fibers (rayon and others). I would like to point out that part of the said reclaimed cotton is of excellent quality, and in this connection I add that I prepared the said four fictitious invoices in view of the difficulty of proving the cost of the shredded cotton, since this cost must include that of the work done at my factory and the related losses (shredding loss, washing loss, dyeing cost, dyeing loss, etc.).

QUESTION–In the same period of time when you sold the said blankets, did you sell other blankets or other fabrics involving the use of new cotton waste?

ANSWER–As you can see from the accounts I am showing you, I made only a few other sales, since I did mostly processing for customers, in addition to making the said blankets. The said small sales involved wool items or items in which reclaimed cotton was used and not new cotton waste.

QUESTION–Have you anything else to add?

ANSWER–I have nothing to add. [Defendant's exhibit H–2.]

In his oral deposition, Mr. Sbraci acknowledged that he had made the foregoing statement in the following testimony:

[Q.] Now I show you Plaintiff's Exhibits 1(U), 1(V), 1(M) and 1(R) for identification which are allegedly purchases of material of "cascami di cottone nuova" from "The Toscana Company, Inc." and I ask you whether these are some of the invoices which you refer to as those which do not appear regular?—[A.] Yes so far as the I.G.E. irregularity is concerned.

[Q.] Who prepared these invoices?—[A.] I did.

[Q.] Do you recall signing a statement in 1960 to the effect that these four invoices are fictitious and do not reflect the purchases of new cotton waste from "The Toscana Company, Inc."?—[A.] Yes. Exactly on the 27th of April, 1960, to the Investigative Unit of the Italian fiscal agents. Of course my statement needs to be clarified. In January, 1960, the firm Fratelli Sbraci fu Alimo entered into an agreement with creditors to settle its obligations at 40% with the surrender of its assets. (The owners were left penniless.) However, this acceptance on the part of the Tribunal was subordinated to the regular administration and to the evidence of the same. Therefore, when,

during the month of April, 1960, the Investigative Unit of the Italian fiscal agents made their inspection on the premises – had I declared that these invoices were true, but that they were not in order as far as the I.G.E. tax was concerned, the firm of Fratelli Sbraci fu Alimo would have been fined for about a maximum of 1,500,000 lire in addition to the tax which was evaded. This would have perhaps meant the annulment of the creditors' agreement and the declaration of bankruptcy. The owners, Oscar and Metello, wanted to avoid giving up everything they had.

[Q.] Mr. Oscar Sbraci – since you personally prepared the four invoices on the stationery of "The Toscana Company, Inc.", which at that time was out of business, the invoices were fictitious, were they not?—[A.] I don't understand.

[Q.] Were you a representative of "The Toscana Company, Inc." at the time you made out the four invoices?—[A.] What do you mean by a "representative"?

[Q.] Were you an employee or an agent of "The Toscana Company, Inc." at the time you made out the invoices to your own company?—[A.] No.

[Q.] Since "The Toscana Company, Inc.", on which stationery the invoices were made out, went out of business on November 30, 1949, how did you get the stationery of a defunct company?—[A.] It was given to me by Luciano Sbraci.

[Q.] At whose request did you make these four invoices?—[A.] The request of no one.

[Q.] Isn't it true that Mr. Larry Curtis was urging you to obtain additional documentation which he could supply to the United States Customs?—[A.] Yes. He made requests to obtain documentation for the purchasing of the cotton but he did not suggest that I make these invoices.

[Q.] Why? Didn't he need them?—[A.] The requests that Mr. Larry Curtis made to me were for a documentation concerning the purchasing of the cotton but naturally he was not suggesting to me to make invoices of merchandise that he could not have known from whom it was purchased and when.

[Q.] Mr. Sbraci – you testified that Mr. Curtis visited your place of business frequently and that you showed him invoices and other records to substantiate the facts concerning the materials in the blankets which you manufactured for him. Is that correct?—[A.] I wish to know when I made this declaration because I do not remember.

[Q.] In what year did you make out these four invoices – Plaintiff's Exhibits 1(R), 1(M), 1(U) and 1(V) for identification?—[A.] I don't remember.

[Q.] Mr. Sbraci – are the statements about the payment of the I.G.E. tax which are typed on "The Toscana Company, Inc." invoices of December 12, 1955 and December 28, 1955 and identified as Plaintiff's Exhibits 1(U) and 1(V) for identification, false?—[A.] To this question I reply making reference to my previous declaration regarding the irregularities mentioned by me.

[Q.] I show you a statement of April 27, 1960 which you gave to the Italian Treasury Agents, the "Guardia Di Finanza" and ask you if that is your signature and if the statement contained therein is true?—[A.] That is my signature. I recognize it. All the declarations contained in that document are in accordance with the declaration which I made above. [Oral deposition pages 81–84.]

The foregoing exhibits and testimony indicate the total unreliability of Mr. Sbraci. It was amazing indeed that counsel for the plaintiff would offer in evidence the fictitious exhibits in question. It would seem that counsel at the time of the offer did not know of the existence of the statement contained in defendant's exhibit H–1 which is translated as defendant's exhibit H–2. However, said counsel was aware at the time of offering, under redirect examination, plaintiff's exhibits 4(A) through 4(D), the alleged I.G.E. tax receipts, that said four invoices were indeed fictitious.

It is important to note that the record is devoid of any reliable documents to corroborate the statements made by Oscar Sbraci.

It might be added that, even if that portion of the witness' testimony which is not conceded to be false were given full consideration, it would fall far short of showing the imported blankets were in chief value of cotton as contended by the plaintiff.

Under the record as presented, it is clear to the court that the plaintiff has fallen far short of establishing that the classification made by the collector is erroneous. Neither has the plaintiff discharged the burden of showing that its claimed classification is correct.

The protests are, therefore, overruled and judgment will be entered accordingly.